DYNAMIS LLP

Eric S. Rosen
(617) 802-9157
erosen@dynamisllp.com

Hon. John P. Cronan
U.S. District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY
10007

**Re: *United States v. Tianyu Fu a/k/a Tian Yu Fu*, No. 1:25-CR-00539-JPC (S.D.N.Y.)**

Dear Judge Cronan:

We represent Defendant Tianyu Fu in the above-referenced action. We respectfully submit this sentencing memorandum on behalf of our client in advance of his sentencing on February 18, 2026, at 2:00 p.m., in front of this Honorable Court.

Tianyu Fu appears before this Court as a first-time offender who has already served more than 13-months in custody at the Metropolitan Detention Center in Brooklyn, New York ("MDC"). The defense respectfully submits that a sentence of time-served is sufficient, but not greater than necessary, to ensure that justice is done. As set forth below, Tianyu played a relatively minor role in a scheme to transfer criminal proceeds from the United States to China. As part of that scheme, Tianyu set up bank accounts, generally using falsified passports and other identification documents. For that, Tianyu is deeply remorseful and ashamed. But to be clear, and not as an attempt to deflect responsibility, he did not have *any* role in the underlying "Tech Support Scheme." In fact, he did not even know about the Tech Support Scheme. When he first got an inkling that the money he was moving back to China was proceeds from crime victims, he voluntarily ceased participating in the bank fraud scheme and, months later, decided to move back to China with his fiancée. He was arrested boarding his plane at JFK Airport.

[redacted]

[redacted]

Tianyu is deeply remorseful for his conduct and has already taken proactive steps to prepare for his future. Submitted with this sentencing letter are letters from family, friends, and colleagues, including individuals who he has served time with at MDC. *See* Exs. A-J & S. Tianyu also submits a letter to this Court in his own words, explaining the nature of his offense and what he hopes to do upon his release from prison and return to China. *See* Ex. T. In addition, while it is easy to do nothing at MDC and awaiting sentencing, Tianyu did not do that. Tianyu educated himself, helped others, and earned a myriad of certificates of achievement that are attached hereto. *See* Exs. K-R. For Tianyu, the last 13-months have been a wakeup call that he has not ignored.

For all these reasons, and the numerous additional reasons set forth below, the defense respectfully submits that a sentence of time-served is sufficient, but not greater than necessary, for sentencing. Further, because Tianyu has already consented to an ICE Final Order of Removal, and he asks that he be allowed to voluntarily depart the United States for China after his release from incarceration. In case this Court finds that further incarceration is necessary, Tianyu requests that this Court transfer him to serve his time in ICE's custody while he undergoes the lengthy formal process of deportation to China.

## I. TIANYU'S BACKGROUND AND CHARACTER

### A. Tianyu's Upbringing, Education, and Family

Tianyu was born in China on October 3, 1994. Tianyu was raised by his parents—Guang Quan Fu and Hao Wen Dong—in Jiangsu, China. Mr. Fu and Ms. Dong are hardworking, contributing members of society. His dad works for the Chinese government. While Tianyu has no siblings, his extended family is close-knit. His two aunts, uncle, and cousin continue to live in Jiangsu and when Tianyu lived in China, he saw them often. In school, Tianyu was involved in many activities, including basketball, k-carts, skiing and the young journalist program at a local newspaper. Tianyu is social and remains close with many of his school friends. Many of his friends and family—including Dong Tianyi, Steven He, Cui Haoran, Michael Luo, Wang Lining, Wu Jian, and his fiancée, Wenweng Yang—submitted letters on Tianyu's behalf (discussed below) and look forward to reconnecting with Tianyu and supporting him when he returns to China.

In high school, Tianyu's passion for photography and the arts blossomed. Tianyu's passion for the arts followed him to college at Nanjing Normal University in Nanjing, Jiangsu where he received a bachelor's degree in art and design. Tianyu continued his education at this university and received a master's degree in art.

After graduation, Tianyu worked at the Deji Art Museum in Nanjing, China. Here, Tianyu worked in the audio and video department. Tianyu had dreams of seeing his photographs in a museum one day but was not sure if he had the talent. Regardless, Tianyu turned his passions into work, and he engaged in paid photography and social media projects

during college. Tianyu would post his own art on social media and also post reviews for technology products online.

At the end of 2023, Tianyu reconnected with his now fiancée, Wenweng Yang ("Yuki"). Yuki and Tianyu met in college and are both from Jiangsu. Yuki is an architect. The love of his life, Tianyu cannot wait for his return to China to be with Yuki. He hopes to soon get married and start a family. A letter in support from Yuki is submitted as Exhibit H. Yuki recalls meeting Tianyu in college and describes him as "a top student who balanced academic excellence with artistic creativity, winning multiple awards for his photographic works, but also as a warm-hearted volunteer who devoted his spare time to organizing charity photography exhibits for underprivileged communities." Ex. H. Yuki professes, while asking this Court for his release, that she "will always stand by him as he strives to become a better person." *Id.*

**B. Tianyu's Experience in the United States**

Tianyu always had a strong interest in the cultural connections and divides between China and other cultures, including the United States. Indeed, Yuki writes that when Tianyu "came to the United States, he never forgot his desire to promote cross-cultural understanding." *Id.* This stems from Tianyu's volunteer work in China, whereby he engaged in activities involving China's relationship with the US.

In June 2022, as the COVID pandemic in China waned, Tianyu came to the US. China was largely still in quarantine and Tianyu wanted to come to the US, like many others, to take advantage of new possibilities, opportunities, and make money. Tianyu recounts the pandemic in China as being very regulated and restricted. As a result, Tianyu's mental health suffered from the isolation and he became more nervous and scared than he had been in the past. The impact of the pandemic made the US even more appealing to Tianyu.

*i.* *Savannah, Georgia*

Tianyu's now ex-girlfriend (not Yuki) was in school in the US at the Savannah College of Art and Design in Savannah, Georgia ("SCAD"). While Tianyu was also accepted to study at SCAD, he could not afford the tuition. Tianyu came to the US with significant debt in China (approx. $70,000) which carried high interest and monthly payments of about $2,000. Tianyu felt significant pressure to find work to be able to make these payments.

When Tianyu arrived in the US he lived with his ex-girlfriend in Savannah. Tianyu was largely working on social media posting photographs and tech reviews. He generally received money through the Chinese social media apps (through user engagement and advertising). Tianyu was also helping his then-girlfriend assimilate to the US, including by helping with translation because she did not speak English. Other than his ex-girlfriend, Tianyu did not know anyone else in Savannah and had very few contacts in the US. During this time, Tianyu was also introduced to running, which quicky became a regular hobby. This lead Tianyu to run numerous races across the US including in Chicago, Boston, and Long Island.

Tianyu also continued his history of volunteering in the US with a Chinese cultural association that helped connect Chinese and American cultures and provide a community in the US for Chinese nationals. While the organization was in Boston, Tianyu was able to volunteer from Savannah or other locations by filming and editing videos for the organization. Tianyu volunteered with his friend, Gary Yu. Gary wrote a letter in support of Tianyu that is attached hereto as Exhibit A. Gary recalls during this time that Tianyu "demonstrated responsibility, reliability, and a strong work ethic" and that Tianyu "showed genuine willingness to contribute positively to the community without expectation of personal gain." Ex. A. In November 2022, it was his involvement in this organization that earned Tianyu a Certificate of Recognition from the City of Boston for his commitment and dedication to serving the Asian community and beyond. *See* Ex. K. This certificate was awarded to him by Boston mayor Michelle Wu.

Tianyu dreamed about sharing his experiences in the US when he returned to China. Tianyu emulated the people in the US, and longed to tell people back home that Americans are nice, respectful, and caring—unlike the way they are portrayed to the Chinese. Yuki states that Tianyu "truly saw himself as a bridge between two cultures, and the praise from viewers calling him 'a digital ambassador of goodwill' was a testament to his sincere efforts." Ex. H. Tianyu dedicated time to this passion through volunteering at community resource programs serving Chinese nationals.

*ii.* *<u>Flushing, Queens</u>*

While in Georgia, Tianyu was constantly seeking out opportunities and desired more than Savannah could offer. Tianyu was stressed, worried about his ability to pay off his debt and make a good, honest living. Sadly, Tianyu and his ex-girlfriend also broke up around this time and he was suffering emotionally. Tianyu knew that Flushing, Queens was the epicenter for Chinese nationals in the US. Knowing that he did not have working status in the US, Tianyu thought that a place like Flushing would offer the most opportunities for him. Tianyu also knew that New York City would offer more social media opportunities and content.

Tianyu's friend Gary Yu helped him find a job at a package store in Flushing after learning of his financial trouble. Tianyu was able to find a room for rent at approximately $800 per month and he moved to Flushing, Queens in early 2023, hopeful of making a better life.

In Flushing, Tianyu made videos and wrote reviews of the tourist sites around New York City. He also continued with his photography—Tianyu would take photos of different people on the street and talk to them about their stories and experiences. His fascination with US culture continued. Tianyu also remained involved in local Chinese national non-profits. Tianyu tried to stay busy with hobbies and interests because, other than his colleagues at the package store, Tianyu did not have friends or contacts. Despite being in New York City, Tianyu still felt isolated and without the support he had in China.

*iii.* *Boston, Massachusetts*

In or around June 2023, Tianyu was presented with a job opportunity as a consultant in Boston, Massachusetts. A friend Tianyu met in the US was opening a printing company and Tianyu was experienced with the equipment they used. The move to Boston served three purposes for Tianyu: (1) he was able to connect with a friend and escape the loneliness he was feeling in Flushing; (2) he felt more connected to the work as it more closely aligned with his passion in the arts; and (3) he thought it was an opportunity for more money. Tianyu enjoyed being in Boston and working at the printing company.

In or around August 2023, the printing company moved from Boston to New Hampshire and Tianyu relocated back to Flushing, Queens.

**C. Letters of Support Amplifying Tianyu's Character, Remorse, and Immense Support at Home in China**

These letters are not offered to excuse Tianyu's conduct. Rather, they demonstrate that this offense is profoundly inconsistent with his enduring character and is an aberration in a life driven by purpose and passion. Tianyu is deeply remorseful. He has spent the year since the offense conduct proactively bettering his life and preparing to start a family of his own. Tianyu is desperate to return home to China to the people who love him most and can provide the support system he is lacking in the US.

Tianyu has the support of an entire community upon his return to China. Tianyu's parents, fiancée, cousin and other family members all live in Jiangsu, China. *See* Exs. B-G. Tianyu's cousin, Dong Tianyi, wrote to the Court that "Tianyu's absence has been devastating for our family. His Mother—my aunt—often cries in private, trying to hide her pain, but we can all see her suffering. Furthermore, our grandfather and grandmother, who are nearly 90 years old and in poor health, miss him dearly…. Their greatest wish is to see their grandson again." Ex. B.

Tianyu's childhood friend Steven He states that he "sincerely believe[s] that [Tianyu] is capable of reflection, accountability, and genuine personal growth" and that he "truly believe[s] that with guidance and an opportunity for redemption, he can continue to be a constructive and responsible member of society." Ex. C.

Tianyu's longtime friend Cui Haoran states that Tianyu's "return is not only the fervent wish of his family but also the shared hope of all who car for him." Ex. D.

Another friend, Michael Luo, writes that "[m]any people—including his parents, his partner, his friends like me—are waiting for him, ready to support him when he returns. We all believe he will rebuild his life and never repeat the same mistakes again." Ex. E.

Tianyu's high school classmate, Wang Lining, writes that "[s]o many people who love him are waiting for his return" and states that Tianyu is "not a reckless or harmful individual. He is reflective, capable of learning from mistakes, and deeply aware of the impact his actions have on others." Ex. F.

Lastly, Jian Wu, another friend from high school writes, "[y]our Honor, I implore you to look beyond the single misstep and consider the full scope of Tianyu's character: his lifelong kindness, his genuine remorse, his remarkable talents, and his clear potential for rehabilitation… All those who love him—his family, his partner, and his friends—are counting on your compassion and fairness to give him the opportunity to rebuild his life." Ex. G.

## II. THE OFFENSE CONDUCT

Tianyu did not make the Government indict him (as is his right). Rather, Tianyu wanted to accept responsibility and he pled guilty to a one-count Information for conspiracy to commit bank fraud under 18 U.S.C. § 1349. As the written plea agreement and PSR reflect, the core conduct is not in dispute.

In mid-2023 when Tianyu was working at the package store in Flushing, he was introduced to a frequent customer: Jiangning Wang. Wang started asking Tianyu to receive mail on his behalf and would tip him in small amounts. Delivery of personal mail or packages to a package store is common practice in New York City, where mail is often stolen or lost from apartments. Tianyu gave Wang his phone number to help communicate about his packages. Tianyu recalls Wang as very friendly and not very serious. While it didn't appear that they had common interests, Tianyu enjoyed their social interactions in contrast to his isolation. Simply put, was nice to talk with a friendly person. Wang tipped Tianyu well during this time period and had many packages delivered to the package store.

While Tianyu was in Boston, Wang reached out to offer him a job. The timing was perfect for Tianyu because his friend's printing company was relocating to New Hampshire. From Tianyu's experience with Wang, he seemed important. Wang offered Tianyu more money than he was currently making. At this time, Tianyu had no knowledge of anything criminal that Wang was involved in. Tianyu did not have intentions to find work that was not honest. He felt pressure to find his next job since he knew his time at the printing company was coming to an end and he desperately wanted to find something consistent and reliable. At this time, Tianyu did not know of any other options, and he knew opportunities were limited because of his immigration status.

In or around September 2023, Tianyu started working for Wang. During this time, Wang provided very limited information to Tianyu. Tianyu was directed to translate for another individual who worked for Wang. Tianyu, in effect, accompany others into banks where the other people would set up bank accounts. At this time, Tianyu's work was largely confined to providing translation services—*i.e.* translating the conversation between a bank employee and Wang's employee.

In approximately November 2023, the individual that Tianyu translated for stopped working for Wang. As a result, Wang approached Tianyu about taking her place. It is at this time that Wang explained what occurred at the banks and what was expected from Tianyu in this role. Wang also offered Tianyu more money than he was making as a translator as a salary (approximately $8,000 per month).

In his new role, Wang directed Tianyu to go into certain banks and either open a bank account or make a transfer or withdrawal from a bank account that was already open. If Tianyu was to open a bank account, he generally would use a fake passport or other form of identification that was provided to him by Wang. Tianyu, of course, knew that these identifications were fake. Wire transfers soon appeared in the bank accounts opened by Tianyu. Wang, however, did not explain to Tianyu where the money came from. Nor did Wang explain where the money was being sent to, or for what purpose it was being sent. Tianyu naively believed the money was from “investors” for “small businesses” as part of some tax scheme. Wang would tell Tianyu he needed proof of the transactions to show the “investors,” and Tianyu would send Wang pictures of the deposit or withdrawal receipts. Generally, when Tianyu withdrew money from an ATM at the direction of Wang, he would give the cash to Wang or another person who worked for Wang after. Again, none of this is meant to minimize Tianyu’s conduct. It is simply to provide context for how he involved himself in criminal activity.

Critically, during all the time Tianyu worked for Wang, he never personally received the funds he was transferring or withdrawing at the direction of Wang. All of this money was transferred to China or provided to Wang through wire transfers, cash, or check. Thus, while Wang was presumably receiving the millions of dollars from the intended loss figure here, Tianyu was not. When Tianyu was translating, Wang paid him a salary of approximately $3,000 per month. Later, when Tianyu started opening bank accounts and transferring money directly, Wang paid him approximately $8,000 per month. Occasionally, Wang would also pay for Tianyu’s rent for a room in Flushing, Queens or other typical living expenses. But the benefits stop there. Tianyu never received a bonus or lump sum payment with a significant portion of the funds he was transferring, it was all directed elsewhere by Wang.

In or around June-July 2024, Tianyu watched a documentary online about Chinese financial scams. It was at this time that Tianyu connected the dots of what he was doing by opening the bank accounts in fake names. Shortly thereafter, Tianyu stopped working for Wang and, ultimately, in the fall of 2024 he cut ties with Wang completely. Tianyu, however, is fearful that Wang will find him and hurt him, whether in the United States or when Tianyu returns to China. In January 2025, Tianyu decided to return to China, as detailed below. Notably, there was a multi-month gap between when Tianyu voluntarily withdrew from the conspiracy and when he attempted to return to China and was arrested at the airport. In short, Tianyu ceased criminal activity long before he was arrested.

Tianyu fully accepts responsibility for his actions and the offense conduct. Tianyu understands that it was wrong to use fake passports and identification to mislead banks into transmitting funds. Furthermore, Tianyu now understands the impact of his actions. While Tianyu was not aware of the Tech Support Scheme (as detailed in the PSR) until he read the PSR itself, Tianyu can now say that the money he was directed to transfer by Wang was not from “investors” but rather from victims. He strongly regrets having played any part in this conspiracy and the resulting harm to real victims.

[redacted]

[redacted]

[redacted]

[redacted]

**A. Tianyu's Arrest at JFK Airport**

After voluntarily withdrawing from the conspiracy in approximately June or July of 2024, Tianyu turned his attention to his relationship with Yuki, his now-fiancée. Yuki visited Tianyu in New York City at the end of 2024, and on January 3, 2025, they headed to JFK Airport together, intending to return permanently to China to get married and begin their life together. Tianyu had no knowledge that the government was investigating him or Wang. He was arrested while trying to board his flight—at first, he believed he was being detained for overstaying his visa.

The FBI agents who had been investigating Wang, and who had identified Tianyu as a result, arrested him personally. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted] USMS acted on an ICE detainer that had been issued on January 3, 2025, the date of Tianyu's arrest. The detainer had never been served on Tianyu or his counsel; it had been provided only to USMS. Without notifying defense counsel, USMS contacted ICE, which demanded that Tianyu be detained. [redacted] Tianyu was returned to MDC

for the night and taken into ICE custody the following morning. He was held briefly at ICE's New York Field Office before being transported to the detention facility in Batavia, New York, near Buffalo, later that evening.

[redacted] It offered Tianyu only one path back to federal custody: he would have to agree to a Final Order of Removal, waive any and all defenses in his immigration case, forfeit any possibility of returning to the United States in the future, and relinquish his eligibility for benefits under the First Step Act. [redacted]

In good conscience, Tianyu initially decided to take his chances presenting a defense in his immigration proceedings. On March 26, 2025, an immigration judge denied him bond—even though a federal district court had already granted bond on the same charges and the $100,000 cash deposit remained with the Court. Shortly thereafter, the financial strain on his family became untenable, and Tianyu was forced to request the return of the cash bond. With no viable alternative, Tianyu ultimately made the decision to accept a Final Order of Removal so that he could be returned to federal custody. An immigration court granted that request, and Tianyu was remanded into federal custody on May 8, 2025.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## IV. TIANYU'S REMARKABLE ACCOMPLISHMENTS IN MDC

Since arriving at MDC on January 3, 2025, Tianyu's achievements and contributions are astonishing. Tianyu has committed himself to being an active member of the MDC community and invested in his personal growth. As detailed in his letter to this Court (Exhibit T), Tianyu sought to redeem himself in MDC. That he did.

First, Tianyu became an orderly with the intake unit at MDC. The title "orderly" doesn't do him justice. In his role, Tianyu was likely the first friendly face that 30 new Chinese inmates saw during intake. *See* Ex. T at 3. Tianyu helped his fellow inmate get adjusted by providing hygiene products and helping them set up their accounts. *See* Ex. T at 3; Ex. S. Tianyu's impact on these individuals is captured in a letter from inmate Mathew James—and inmate that met Tianyu in his role as orderly. *See* Ex. S. Mathew states that Tianyu was "one of the bright spots" of the intake unit, that Tianyu gave Mathew his personal hygiene products to make sure he had enough, and that Mathew sees Tianyu helping other Chinese inmates with their phones and computers. *See* Ex. S. Tianyu deeply cares and the other inmates notice. Tianyu received a work performance rating report from his counselor for his work from August 28, 2025 through January 17, 2026 as "outstanding." *See* Ex. Y. The counselor states that Tianyu is "well organized, dependable, timely, and always brings a positive attitude to his work." *See id.* Additionally, Tianyu received a score of "Outstanding. Does superior work" for every evaluation category. *See id.* This role at MDC ended up being a perfect fit for Tianyu—fostering his passion for bridging cultures, helping Chinese immigrants assimilate in new environments, translating, and lending his knowledge in tech products to others.

Second, Tianyu has received at least nine certificates of completion and achievement from different programs at MDC.[1] *See* Exs. P-V. Four of these certificates are for completion of different psychology workbooks, helping Tianyu address his mental health struggles and anguish from being incarcerated. *See* Exs. P-S. Two of these certificates are for completion of workout activities, showing Tianyu is proactively addressing his physical health while in custody. *See* Exs. T-U.

Tianyu's final certificate attached in support is for his completion of and graduation from the Focus Forward Program at MDC. *See* Ex. V. The Focus Forward Program is a 13-week (26 hour) course where inmates complete weekly reading and journal assignments and learn life skills to help them create a plan for reentry.[2] Hannah Jopling, Ph. D., the volunteer

---

[1] Tianyu received two of these certifications after the last meeting with counsel and will bring hard copies to his sentencing in person.
[2] *See* https://focusforwardproject.org/ (last visited on Feb. 6, 2026).

teacher of Tianyu's program provided a letter in support of his sentencing. *See* Ex. M. Dr. Jopling is also expected to attend Tianyu's sentencing in person. Dr. Jopling states that Tianyu "engaged thoroughly with every assignment, class discussions, and readings, and drew lessons from them." *Id.* at 1. Tianyu's fellow participants described him as "thoughtful, helpful, funny, very smart, humble, talented, and kind." *Id.* at 2. Most notably, Tianyu's fellow participants selected him as one of two graduation speakers. *Id.* Dr. Jopling ends by stating that she "enjoyed having such a bright and conscientious person in the class." *Id.*

Finally, Tianyu took on the challenge of improving his English completely on his own initiative. *See* Ex. T at 4. Tianyu had his friend send him a Chinese-English dictionary that he used to look up words and phrases as he reads. *Id.* Tianyu has read over 25 books in MDC. *Id.*

## V. THE 18 U.S.C. § 3553(a) FACTORS

The Guidelines are, of course, the "starting point and initial benchmark," but they are not the end of the analysis. *See Gall v. United States*, 552 U.S. 38, 49 (2007). A Court may tailor its sentence in light of other statutory concerns. *See United States v. Booker*, 125 S. Ct. 738, 743 (2005). Most critically, "the court may not presume that the Guidelines range is reasonable. The court must make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49–50. Accordingly, the Court must fashion a sentence that is sufficient, but not greater than necessary, to satisfy the purposes in § 3553(a). In this case, those factors strongly support a sentence of time served for Tianyu.

### A. The Nature and Circumstances of the Offense

The offense conduct is detailed in both the PSR and above. Tianyu takes complete and total responsibility for the crimes he committed and makes no excuses. However, there are three key factors Tianyu asks this Court to take into account: (1) Tianyu's financial and emotional vulnerability during his time in the US was a deviation from his otherwise exemplary and crime-free life; (2) Tianyu's relatively-limited involvement in just the bank fraud conspiracy (as opposed to the far more serious Tech Fraud Scheme); and (3) Tianyu's acceptance of responsibility and plea to an intended loss amount for *far* more money than he made from his involvement in the scheme.

First, Wang preyed on Tianyu and other Chinese nationals. Wang slowly formed a relationship with Tianyu at his place of work, tipping him frequently when Tianyu was financially strained. Wang then offered Tianyu a job—translator—that came with good pay. It was only then that Wang introduced Tianyu to the scheme. Tianyu did not come to the US to seek out crime; he came here for a better life. Without Wang, Tianyu would not have been in this situation.

Second, Tianyu asks this Court to consider the significant forfeiture and intended loss figures that Tianyu agreed to accept responsibility for. It is undisputed that the millions of dollars at issue flowed through accounts created by Tianyu and others; However, Tianyu did not receive this money personally. Tianyu received a salary for his efforts of about $8,000 per month. Tianyu barely made ends meet in New York City and has no current assets or cash

to his name.

**B. The History and Characteristics of the Defendant**

Tianyu's history and characteristics cut sharply in favor of leniency. He has no criminal history whatsoever—no juvenile adjudications, no adult convictions, no prior arrests. The conduct that brings him before this Court is a stark aberration, and it is not something that anyone who knows him well saw coming.

Tianyu has spent these last thirteen months in custody engaged in sustained reflection about his future. When released, he wants to return to China, marry his fiancée Yuki, and start a family in their hometown. Tianyu is particularly hopeful that he can return while his grandmother, who is 85 years old and in poor health, is still alive. His mother, too, has been navigating health difficulties exacerbated by the stress of his arrest, and Tianyu wants to be there to help care for her. He is profoundly grateful that his parents will welcome him home with open arms and provide a stable, loving environment for him to rebuild his life.

Remarkably, rather than being defeated by his time in custody, Tianyu has taken advantage of his time by helping others. He has been an avid volunteer in prison—he has helped nearly 30 new Chinese inmates get settled and acquainted with prison life. *See* Ex. T. He also participated in the Focus Forward Project, the fourteen-week reentry course he graduated from at MDC in January 2026. *See* Exs. J, T, R. As the Focus Forward facilitator, Dr. Hannah Jopling, wrote to this Court, Tianyu "took full advantage of everything Focus Forward offered him," engaging thoroughly with every assignment, discussion, and reading. *See* Ex. J. His fellow participants described him as "thoughtful, helpful, funny, very smart, humble, talented, and kind," and they selected him as one of only two graduation speakers. *See id.* In his own words during the program, Tianyu reflected: "The 11 months I spent in MDC Brooklyn have already changed me a lot. This experience of incarceration gives me another perspective on my life. I realized that I should be responsible for my family and myself. I have to respect the law, respect order, respect people. I should make wise decisions with my wisdom and courage." *See id.*

The letters submitted to this Court from family, friends, and colleagues collectively establish that Tianyu is a kind, compassionate, and deeply talented young man whose involvement in this offense is fundamentally inconsistent with the life he has led. His childhood friend Steven He, who has known Tianyu for over sixteen years, describes a person of "optimism, kindness, and humor" who developed a genuine curiosity about cross-cultural storytelling that later defined his career. *See* Ex. C. Steven recounts that Tianyu built a successful career as a content creator in China, producing original media that reached millions of viewers, and that he participated in international cultural exchange programs—including a collaboration with Apple and service as a youth delegate in a Nanjing-Paris cultural exchange. *See id.* His friend Jian Wu writes that Tianyu has always prioritized others' needs over his own, recalling an incident in which Tianyu's first response to a friend accidentally breaking his cherished camera was a gentle "Are you okay?" *See* Ex. G. His friend Michael Luo describes Tianyu as "a loyal, sincere, and kind-hearted person" and a dedicated artist whose photographs were featured on the official Leica website—a testament not only to technical skill but to his sensitivity to humanity and the world around him. *See* Ex. E.

These letters also exemplify Tianyu's deep commitment to service and community. Before his arrest, Tianyu volunteered his photography and videography skills, producing content for community-focused projects. Gary Yu, the organization's president, attests that Tianyu "consistently demonstrated responsibility, reliability, and a strong work ethic" and showed "genuine willingness to contribute positively to the community without expectation of personal gain." *See* Ex. A. His fiancée, Yuki, describes how Tianyu served as a volunteer videographer for United Chinese Americans and the Asian Mental Health Initiative of North America, producing public service campaigns to amplify marginalized voices. *See* Ex. H. In 2022, these efforts earned Tianyu a Certificate of Recognition from Boston Mayor Michelle Wu. *See* Ex. K.

The emotional toll on Tianyu's family has been immense. His mother, Dong Haowen, writes that learning of her son's arrest was "a complete shock" and that the past year has been "the most agonizing period" of her life. *See* Ex. I. She has borrowed money to pay legal fees, and the stress has taken a severe toll on her health. *See id.* She has hidden the truth from Tianyu's maternal grandmother—who is eighty-five, bedridden with paralysis, and asks to see her grandson every day—fearing that the news would be more than she could bear. *See id.* Through it all, the family has maintained contact with Tianyu through letters, and his mother reports that "from every word he writes, I can clearly sense that he is truly remorseful and is determined to turn over a new leaf." *See id.*

Finally, Tianyu asks this Court to take into account his Final Order of Removal. Because of this Tianyu will not receive any First Step Act credits. Further, to the extent that Tianyu is still a danger—to be clear, he is not—Tianyu's deportation order will return him to China. Courts in this district have considered immigration status and deportation under these circumstances. Specifically, in *United States v. Sarpong*, the court held that "[i]t may be that a sentencing judge can consider deportation when he or she identifies, with some particularity, why a certain defendant is certain to be deported and why deportation, in light of that defendant's individual circumstances, will serve to protect the public." No. 04-CR-1106-LTS, 2020 WL 5578420, at *2 (S.D.N.Y. Sept. 17, 2020) (*quoting U.S. v. Willis*, 476 F.3d 103, 109 (2d Cir. 2007)). The same circumstances apply here.

### C. The Need for the Sentence Imposed

#### i. <u>*Promoting Respect for the Law and Protection to the Public and Recidivism*</u>

Tianyu's respect for the law since his arrest in incontrovertible. As an example, Wu Jian, Tianyu's friend from high school writes to this Court that:

> "[a]s a Chinese police officer, I have dedicated my career to upholding justice and understanding the complexity of human behavior. I know better than most that people are not defined by their worst mistakes. Through our regular correspondence while he has been I custody, I have seen a man consume by genuine remorse. He does not deflect blame or make excuses; instead, he has confronted his actions head-on, reflecting deeply on the harm he caused to his family, friends, and the trust of society. He has told me that this period of reflection has been a wake-up call—a harsh ut necessary lesson that has taught

him the importance of accountability, the inviolability of the law and the irreplaceable value of freedom." Ex. G.

With the assistance of his family and friends, Tianyu has tailored a thoughtful post-incarceration plan that will both ensure the safety of the public and his successful reintegration into society. Tianyu's parents have provided uncompromising support to their son since learning of the offense conduct. They are willing to continue these efforts by offering a Tianyu a safe and stable environment to transition. Once Tianyu is released and deported back to China, he plans to live with his parents. As stated above, this is in the same Province as Yuki, his fiancée. Tianyu's childhood friends and extended family are also looking forward to supporting him upon return. This unwavering support by family and friends will ensure that Tianyu's transition runs smoothly.

Once he returns to China, Tianyu's primary goal is to find a stable and honest job. While Tianyu is open to any legitimate employment, he is hopeful to find a job involving the arts or technology. As stated above, Tianyu was very inspired by the Focus Forward Program at MDC and is interested in finding or creating a similar program in China. Tianyu believes that the US system has more programs and opportunities for education and recidivism than China. He is passionate about helping inmates in China get these opportunities.

Finally, as more of a hobby, Tianyu is interested in recounting his experience and story to help others. Tianyu would like to author a book or start a podcast about where he went wrong, his experience in the US federal jail system, and how these experiences have redirected his life. Tianyu believes this is also a way to continue exploring his passion about the cultural differences and interactions between Chinese and American cultures. He is interested in learned about other peoples' experiences and perspectives as well.

*ii.* *Adequate Deterrence*

Both specific and general deterrence are amply served by a below-guidelines sentence. As to specific deterrence, Tianyu poses virtually no risk of recidivism. He has no criminal history of any kind. He voluntarily withdrew from the conspiracy before he was ever aware of the investigation. He has a Final Order of Removal and will be deported to China upon completion of his sentence, where his family, his fiancée, and every source of stability in his life are waiting for him. He has no ties to the United States, no ability to return, and no incentive to engage in further criminal conduct. His thirteen months at MDC—during which he witnessed violence, endured the ICE detainer ordeal, and was separated from everyone he loves—have left an indelible impression. As to general deterrence, certainly the more than one-year in MDC-Brooklyn, an institution with severe, known problems, would convince anyone not to engage in similar conduct.

Tianyu's case presents even stronger grounds for a below-guidelines sentence than the typical case reflected in those statistics. Unlike many defendants at this offense level, Tianyu has no criminal history points, voluntarily withdrew from the conspiracy, [redacted] A sentence in the range of time served would be consistent with—

indeed, well-supported by—the sentencing practices of courts throughout this District.

*iii.* *Educational, Vocational Training, Medical Care, or Other Treatment*

Tianyu does not require educational, vocational training, medical care or other treatment. Tianyu has a master's degree from China and continues to self-educate and learn while in custody. Tianyu has also developed substantial practical skills while in custody, which will help him readjust to society in China.

**D. Pertinent Policy Statements**

Tianyu's guideline range of 51 to 63 months is driven almost entirely by the intended loss amount of more than $6 million, which accounts for an 18-level enhancement under § 2B1.1(b)(1). Notably, Tianyu received virtually none of this money himself. Moreover, the vast majority of the $6 million did not even flow through accounts he set up. Rather, the money went through accounts of co-conspirators. In total, the salary that Tianyu was paid amounts to approximately 1% of the total loss amount. Accordingly, and for this case, the Guidelines bear no resemble to what Tianyu's sentence should actually be. *See, e.g., United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) (Rakoff, J.) (for certain fraud cases, ruling that "calculations under the guidelines have so run amok that they are patently absurd on their face.").

In addition, had Tianyu been sentenced just a few months later, it is possible that his Guidelines Range would significantly decrease. On December 12, 2025, the Sentencing Commission released Proposed Amendments to the Guidelines.[3] As relevant here, Tianyu's loss amount would decrease by two-levels (*see* page 59), and there is a two-point deduction for voluntarily ceasing criminal activity prior to knowing of a criminal investigation. *See* page 70-71.

While not, of course, enacted yet, this Court should consider these proposed amendments when sentencing Tianyu.

**E. Avoidance of Unwarranted Sentencing Disparities**

There are multiple reasons why Tianyu should receive a sentence of time-served. *First*, Tianyu's time in custody at MDC, an institution long known for its terrible conditions, warrants a substantial reduction in his sentence. S*econd*, because of Tianyu's Final Order of Removal, he will most likely not be released from custody after serving his sentence.

With respect to MDC, judges routinely take the conditions at MDC into account when sentencing defendants. *See United States v. Colucci*, 743 F. Supp. 3d 452, 455 (E.D.N.Y. 2024) (collecting cases) ("[a]llegations of inhumane treatment at MDC continue, however, and judges in this district are subject to a steady drumfire of such charges, often uncontested by prosecutors. And these issues continue to affect judicial determinations."); *see also United*

[3] https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202512_rf-proposed.pdf (last visited on Feb. 6, 2025).

*States v. Kaplan*, No. 23-CR-00293 (JMA)(JMW), 2025 WL 2263653, at *6 (E.D.N.Y. Aug. 7, 2025), *aff'd*, No. 23-CR-00293-JMA-JMW, 2025 WL 2403397 (E.D.N.Y. Aug. 19, 2025), *aff'd*, No. 25-2060, 2025 WL 3485026 (2d Cir. Sept. 25, 2025) ("The Court is cognizant of the reality of MDC and the many decisions that have written on such conditions."); *United States v. Nunez*, No. 23 CR. 517 (AT), 2024 WL 4504493, at *6 (S.D.N.Y. Oct. 16, 2024) ("The approximately six-and-a-half months Nunez spent at MDC after sentencing are 'materially different than [time] served at a jail or prison elsewhere in the United States,' and the Court recognizes that 'it is routine for judges in both this District and the Eastern District [of New York] to give reduced sentences to defendants based on the[se] conditions[.]'" (citations omitted)); *United States v. Chavez*, 710 F. Supp. 3d 227, 236 (S.D.N.Y. 2024) ("the Court holds that the conditions at the MDC constitute 'exceptional reasons' why detention of most defendants who do not pose a risk of flight or danger to the community, including Chavez, 'would not be appropriate.'").

In *United States v. Parish*, Judge Analisa Torres summarized specific conditions at MDC that inmates are subject to including: "near-perpetual lockdowns that prohibit detained persons from leaving their cells for visits, calls, showers, classes, or exercise—conditions that are tantamount to solitary or near-solitary confinement"; "the physical conditions of MDC include mold, contaminated drinking water, broken lights, and broken emergency call buttons"; and "chaos reigns, along with uncontrolled violence" because severe staffing issues have led to "violence going unaddressed for extended periods of time, leaving wounded inmates in dire conditions and witnesses perpetually in fear of violence and without protection." *See* No. 13 CR. 829 (AT), 2024 WL 3904626, at *5 (S.D.N.Y. Aug. 22, 2024).

Tianyu has been subjected to these conditions for over 11 months. During this time period, Tianyu estimates he has suffered through over 50-days of lockdowns, witnessed 3-4 stabbings, and an untold amount of physical violence. *See* Ex. T. Tianyu has seen multiple bloody fights where guards have deployed pepper spray. Specifically, around January 2025 Tianyu recalls a time where his pod was contained to their cells and another inmate snuck into his cell to attack his cellmate. Tianyu remembers blood dripping from his cellmate's head and him needing to be brought to the infirmary.

In addition, Tianyu has faced constant issues with placing international calls from MDC. With telephone service, Tianyu has resorted to writing letters by hand and sending them in the mail, which is extremely delayed to-and-from China.

Second, Tianyu will most likely face a far longer sentence than a US citizen. Tianyu is a Chinese National. China has long been designated a "recalcitrant country," meaning it consistently thwarts the US's efforts to deport and repatriate its citizens.[4] Given Tianyu's

---

[4] *See* Jul. 10, 2020, Immigration: "Recalcitrant" Countries and the Use of Visa Sanctions to Encourage Cooperation with Alien Removals, CONGRESSIONAL RESEARCH SERVICE, available at: https://www.congress.gov/crs_external_products/IF/PDF/IF11025/IF11025.7.pdf (last visited Feb. 6, 2026) (listing China as a "recalcitrant" country that "systematically refuse[s] or delay[s] the repatriation of [its] citizens."); *see also* Jul. 12, 2024, China Among 'Uncooperative' Countries Refusing to Take Back Migrants: GOP Letter, NEWSWEEK, available at: https://www.newsweek.com/gop-letter-chinese-migrants-delays-deportation-1924109 (last visited Feb. 6, 2026) (over "1,800% increase in detentions of Chinee national illegally crossing the border since 2020" and delay with Beijing repatriating its citizens.); *see also* Jul. 7, 2025, Recalcitrant Countries: Diplomatic Obstacles to Deportation, FEDERATION FOR AMERICAN IMMIGRATION

circumstances, he will presumptively return to ICE's custody at the time of his release from federal custody. However, once in ICE custody, he will most likely linger in detention, waiting for deportation. *See United States v. Perez Sanchez*, No. 16-CR-661-1 (ARR), 2024 WL 1069884, at *4-5 (E.D.N.Y. Mar. 12, 2024) (court further held "to subject [the defendant] to more incarceration merely because of his immigration status would be "similar in gravity" to a refusal to reduce the term of imprisonment for an individual with a serious health condition or extenuating family circumstances.").

## VI. CONCLUSION

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. In this case the offense is serious, but it is finite in scope, committed by a young first-time offender, and generally at the direction of other individuals. Tianyu has accepted responsibility and agreed to substantial intended-loss and forfeiture figures, despite not directly receiving these funds for himself. [redacted] Moreover, since his arrest, Tianyu has been a model friend, employee, student, and inmate. Tianyu has received 9 certificates from programming at MDC, helped over 30 Chinese national navigate the intake process, and remained in close conduct with his support system despite constant challenges from MDC's capabilities. For all these reasons, additional incarceration is unnecessary. The defense asks Tianyu to be sentenced to time-served.

Dated: February 6, 2026

Respectfully submitted,

/s/ Eric S. Rosen
Eric S. Rosen
Kimberly A. Jones

**DYNAMIS LLP**
175 Federal Street, Suite 1200
Boston, MA 02110
(617) 693-9732
erosen@dynamisllp.com

*Attorneys for Tianyu Fu*

---

REFORM, available at: https://www.fairus.org/issue/factsheet/recalcitrant-countries-diplomatic-obstacles-deportation#_edn1 (last visited Feb. 6, 2026) ("Recalcitrant countries deny the nationality of an alien, delay or refuse to issue travel documents, or simply refuse to accept the physical return of their nationals by flights or other means.").

**CERTIFICATE OF SERVICE**

I certify that on February 6, 2026, a true and correct copy of the above letter was filed with the Court's CM/ECF system, which has generated and delivered electronic notices of filing to all counsel of record.

*/s/ Kimberly A Jones*
Kimberly A. Jones