**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

February 13, 2026

**By ECF**
The Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Tianyu Fu a/k/a Tian Yu Fu*, 25 Cr. 539 (JPC)**

Dear Judge Cronan,

The Government respectfully submits this letter in advance of the February 18, 2026 sentencing of Tianyu Fu. For the reasons set forth below, a below-Guidelines sentence in line with Probation's recommendation of 36 months' imprisonment is necessary and appropriate in this case.

1. **The Offense Conduct**

   A. **The Bank Fraud Scheme**

This case involves a scheme led by Jiangning Wang to fraudulently deposit, withdraw, and transfer millions of dollars (the "Bank Fraud Scheme"). (PSR ¶¶ 7-30.) From at least September 2023 to September 2024, Fu and his co-conspirators, acting at the direction of Wang, engaged in a lengthy and far-reaching conspiracy to move money through the U.S. banking system and ultimately, abroad. They did so through a complex plan involving numerous shell companies, layered money movements, and misrepresentations to financial institutions.

The money that Fu and his co-conspirators were moving was the proceeds of another fraud scheme (referred to herein as the Tech Support Scheme). Members of the Tech Support Scheme executed a nationwide scheme to steal funds from vulnerable victims who were tricked into believing that their computers and/or financial accounts had been compromised. (PSR ¶¶ 7-8.) Specifically, the perpetrators of the Tech Support Scheme held themselves out as employees of technology companies, financial institutions, or federal agencies. (*Id.*) They persuaded victims to transfer funds, or gained access to the victims' financial accounts and conducted the transfers themselves, into accounts controlled by Fu and other members of the Bank Fraud Scheme. (*Id.*) The Tech Support Scheme victims were told that these transfers would ensure that their funds were kept safe. (*See e.g.,* PSR ¶ 14.) The transfers were accomplished through various means, including wire transfers and physical checks. (PSR ¶¶ 7-8.)

Members of the Bank Fraud Scheme set up a network of fraudulent bank accounts specifically designed to receive large deposits of funds, and once funds from the Tech Support Scheme were successfully deposited, they withdrew and transferred these funds to other domestic bank accounts and ultimately, abroad, through a series of misrepresentations.[1] First, Fu and his co-conspirators knew that if they opened personal bank accounts and attempted to deposit and withdraw large amounts of money, the banks would likely flag and potentially reject these transactions. However, banks would be less likely to do the same with money flowing through a business bank account. Accordingly, members of the Bank Fraud Scheme created shell companies with generic names like "Bonnie Trading Servicing, Inc" and "Panda Construction Service Inc" and primarily opened bank accounts in the names of these fake entities. (*See e.g.,* PSR ¶¶ 18, 27.) In the course of opening these accounts, Fu and his co-conspirators held these entities out to be true businesses. They represented that these entities primarily had retail customers and were involved in various industries such as auto repair, import and export, construction, and wholesale of luxury items. They also represented that these businesses sent and received international wire transfers in connection with buying and selling inventory. These were lies that Fu and his co-conspirators told to ensure that the banks did not flag their large transactions as suspicious. Additionally, Fu and his coconspirators often used false identification, primarily international passports, and forged proof of address documentation, such as utility bills, to open these accounts. The fake identification documents contained photographs of Fu or his coconspirators, or photographs of someone who looked similar to them, but with false names, dates of birth, and other information. (*See e.g.,* PSR ¶¶ 16, 22, 27.) These documents were manufactured to look real and contained authentication features, such as holograms and watermarks that were similar to those found on true identification documents. (PSR ¶¶ 30, 38.)

Proceeds of the Tech Support Scheme were deposited into these fraudulent accounts in various ways, including wire transfers and cashier's checks. (PSR ¶¶ 7-8.) Once these deposits occurred, the funds were often withdrawn within days, either in the form of cash withdrawals or wire transfers to other fraudulent bank accounts and, either directly or indirectly, international bank accounts. (PSR ¶¶ 10, 15, 17, 21, 26.) In the course of conducting these transactions, Fu and his co-conspirators continued to misrepresent their identities. (PSR ¶ 10.) Additionally, on several occasions the banks flagged these transactions and asked for additional information about the transactions. Fu and his co-conspirators lied in response to the banks' questions, including misrepresenting the purpose of these transactions, so that the banks would approve them. (*Id.*)

Fu and his co-conspirators fraudulently withdrew and transferred millions of dollars through this elaborate scheme involving numerous shell companies and dozens of fraudulent bank accounts. Over the course of Fu's participation in the conspiracy, $6,208,062.77 was fraudulently withdrawn from bank accounts set up by Fu and other members of the Bank Fraud Scheme known to Fu. (PSR ¶ 29.)

[1] To be clear, Fu is not alleged to have participated in or have specific knowledge of the Tech Support Scheme.

**B. Fu's Role in the Scheme**

Fu was one of several individuals who were hired by Wang to execute the Bank Fraud Scheme. Fu, for his part, was primarily tasked with opening fraudulent bank accounts and withdrawing and transferring funds. In total, Fu opened at least seventeen such accounts, which account for $2,543,103.85 of the fraudulently withdrawn proceeds during Fu's participation in the conspiracy.

Fu was in frequent communication with Wang throughout the scheme. In addition to opening these accounts and moving money, at Wang's direction, Fu engaged in a variety of additional conduct in furtherance of the scheme. For example, Wang tasked Fu with picking up shipments of fraudulent passports and distributing them to other members of the conspiracy. (PSR ¶ 11.) Fu also picked up packages of cashier's checks sent by victims of the Tech Support Scheme and deposited them in the Bank Fraud Scheme fraudulent accounts. He also assisted at least one other member of the conspiracy by serving as an English translator when that co-conspirator interacted with bank employees. (*Id.*) Finally, Wang often asked Fu to check on the status of various bank accounts used by members of the conspiracy, including confirming whether the accounts were active and that specific transactions had been successfully executed, which he then reported to Wang.

For his work, Fu received compensation from Wang, including a regular salary and funding for expenses such as rent and utilities. (PSR ¶ 11.)

**2. Fu's Arrest** [redacted]

Fu was arrested on January 3, 2025, prior to boarding a flight to China. [redacted]

[redacted]

---

[redacted]

[redacted]

### 3. The Plea and Guidelines Calculation

On November 18, 2025, pursuant to a plea agreement, Fu pled guilty to Count One of the Indictment, which charges him with bank fraud conspiracy, in violation of 18 U.S.C. § 1349. In Fu's plea agreement, the parties stipulated to a Guidelines range of 51 to 63 months' imprisonment based on an offense level of 24 and a criminal history category of I. The Probation Office reaches the same Guidelines calculation. (PSR ¶ 81.)

### 4. Applicable Law

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Guidelines are not mandatory; however, it also held that a district court must "consult" the Guidelines and "take them into account" when fashioning a sentence. *Id.* at 264. As the Supreme Court has explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United States*, 552 U.S. 38, 49 (2007).

After that calculation, a court must proceed to consider seven factors outlined in 18 U.S.C. § 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

The statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, pursuant to which the sentence needs:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

While a court may not presume that an appropriate sentence lies within the Guidelines range, "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines

supports the premise that . . . courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. The relevance of the Guidelines throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita*, 551 U.S. at 349. To the extent a court varies from a Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**5. The Court Should Impose a Below-Guidelines Sentence of 36 Months' Imprisonment**

A below-Guidelines sentence of 36 months' imprisonment is warranted in this case given Fu's role in the scheme and [redacted]. Probation recommends the same sentence.

As detailed above, Fu and his co-conspirators engaged in a far-reaching scheme in which they fraudulently withdrew significant amounts of money from various banks in the U.S. As part of this scheme, Fu was entrusted by Wang with opening numerous fraudulent accounts and moving millions of dollars through these accounts. Without regard for the implications of his actions, Fu brazenly lied to banks to open at least seventeen fraudulent accounts in the names of shell companies and using fraudulent identification documents, from which he then withdrew or transferred substantial funds by lying to the banks about his identity and the purpose of his transactions. Over the course of his approximately year-long participation in the conspiracy, Fu acted repeatedly and without hesitation. Over $2.5 million was fraudulently withdrawn from Fu's accounts. This conduct is worthy of a considerable sentence.

However, Fu was not the leader of this scheme. Instead, Fu was one of several individuals who took direction from Wang. Fu was hired by Wang and received a salary and other expenses for his efforts. Fu played a vital role in the scheme and, as described above, carried out several tasks for Wang that furthered the scheme, but the Court should take into account his role and relative culpability to Wang. [redacted] or these reasons, the Government respectfully submits that a below-Guidelines sentence is appropriate.

However, the Court should not go so far as to sentence Fu to time served, as the defense suggests. The defense argues that the Court should impose such a sentence for several reasons, most notably [redacted] the intended loss amount in this case, and the conditions at the Metropolitan Detention Center ("MDC"). [redacted]

[redacted]

Second, the defense argues that the intended loss amount (over $6 million) grossly overstates the seriousness of the offense, because it does not represent the actual amount of money that Fu ultimately retained as part of the scheme, but rather the amount of money that was fraudulently withdrawn from accounts controlled by Fu and his co-conspirators. To the contrary, the intended loss amount should be a significant factor in the Court's assessment of the severity of Fu's conduct. This figure represents what the members of the conspiracy accomplished and what the banks could have lost due to their conduct. Moreover, as described above, Fu's role in the conspiracy would be adequately addressed by the imposition of a below-Guidelines sentence of 36 months.

Finally, Fu raises concerns with the conditions of confinement at the MDC, which he characterizes as "terrible." The defense's complaints, however, are largely generalized and not specific to Fu. In his submission, Fu broadly cites the opinions of various courts that, for example, describe "near-perpetual lockdowns," "mold," "contaminated drinking water," and "uncontrolled violence." Notably, nearly all of the cases cited by the defendant are over a year old. The facts are that the MDC has greatly improved staffing since early 2024. The increase in staffing has been accompanied by fewer inmates, which has contributed to a substantial decrease in violence. Additionally, the MDC has implemented telehealth, providing inmates with increased access to cardiology, dermatology, and gastrointestinal specialists, physical and occupational therapists, and the BOP's opioid treatment program. And several judges in this District, including this Court, have recognized the marked improvements at the MDC. *See United States v. Sandy Carazas-Pinez*, 23 Cr. 346 (JPC) (Sept. 19, 2025 sentencing); *United States v. Clinton McCullum*, 24 Cr. 667 (JPC) (Aug. 29, 2025 sentencing); *United States v. Jean Carlos Burgos*, 24 Cr. 650 (LTS) (May 21, 2025 plea); *United States v. Kevin Reshard*, 24 Cr. 392 (JMF) (May 14, 2025 sentencing); *United States v. Alon Alexander et al.*, 24 Cr. 676 (VEC) (Jan. 16, 2025 bail argument). At bottom, the defendant's generalized complaints about the MDC's conditions of confinement do not support a time served sentence. Moreover, although the defendant has spent over ten months at the MDC, his sentencing submission marks the first time that he has raised any concerns about his conditions of confinement.[4]

---

[3] Fu was initially charged by complaint with bank fraud and money laundering conspiracy. The Government's agreement to resolve this case with a guilty plea to bank fraud conspiracy also represents a significant benefit to Fu.

[4] The Government inquired with MDC personnel regarding Fu's complaint about international phone service. According to MDC records, other than in October and November, Fu has consistently placed calls to China over the past several months. In September, he made over twenty calls to China. In October, he made three calls. In December, he placed twenty calls. And since the beginning of the year, he has placed twenty calls to China.

Fu has served approximately thirteen months in pretrial confinement.[5] Accordingly, the defense's request for a time served sentence would result in a sentence that is thirty-eight months below the bottom of the Guidelines range. Simply put, the defense's arguments do not support such a drastic variance. In any event, a sentence of fifteen months below the bottom of the Guidelines range, as the Government is seeking, would adequately address the purposes of sentencing and account for any mitigating factors raised by the defense in their submission.

**6. Conclusion**

For the foregoing reasons, the Government respectfully requests that the Court impose a below-Guidelines sentence of 36 months' imprisonment.[6]

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:__________________________
Varun A. Gumaste
Assistant United States Attorney
(212) 637-1023

cc: Eric S. Rosen, Esq. (by ECF)
Kimberly A. Jones, Esq. (by ECF)

---

[5] This includes the time from February 24, 2025 to May 8, 2025 that Fu was in immigration custody.

[6] In light of recent Second Circuit decisions, the Government respectfully requests that, for each special condition of supervised release that the Court intends to impose, the Court briefly state its reasons for concluding that each such special condition is "reasonably related" to at least one of the factors set forth in U.S.S.G. § 5D1.3(b). *See, e.g.*, *United States v. Sims*, 92 F.4th 115 (2d Cir. 2024) (vacating special condition and remanding for district court to provide sufficient explanation for imposition of condition); *United States v. Oliveras*, 96 F.4th 298 (2d Cir. 2024) (same); *United States v. Jimenez*, No. 22-1022, 2024 WL 1152535 (2d Cir. Mar. 18, 2024) (summary order) (same).